Okay, it looks like we have counsel for both sides. Welcome. You are in the. Hello, court of Illinois 1st district and the 1st division thereof. My name is Terry lab, and I'll be presiding today along with my colleagues. Justice Michael Hyman and justice. Mary Ellen Coughlin. We are here in the case of Barbara Turner. Versus Concord nursing. The case number is 2023. Number 1 dash 22 dash 1721. And we're basically looking for 15 arguments or so, those arguments from each of you. The appellant should save some time for rebuttal. If we unduly burden you with questions, we'll give you a little bit more time. We're not. Completely fixated on that. But with that, all being said, why don't we proceed? We're familiar with the briefs and the, you know. Case law and everything, but we still want to hear from you. Let's hear from the appellant. Thank you. Good afternoon. And may it please the court. I am rain Montero here on behalf of the defendant appellant. A period on care. This court should reverse the circuit court. When it improperly denied a period on his motion to dismiss. And compel arbitration for 3 reasons. 1st, the arbitration agreement was supported by adequate consideration. 2nd, the arbitration agreement was not procedurally nor substantively unconscionable. And 3rd, Mr. Turner did not lack the capacity to enter into the agreement. Turning to my 1st point, let me ask those 3 arguments that you're making. Which 1, would you say is the 1 that. Yeah, I know you think they're all good, but which 1, would you say is the strongest argument for us to reverse. Well, your honor, the circuit court based its ruling on. Unconscionability, so I would say that that is where the circuit court got it wrong. And that is my strongest argument. So, turning to the unconscionability issue. The circuit court should be reversed because the arbitration agreement was not procedurally nor substantively unconscionable. Beginning with procedural unconscionability. Procedural unconscionability occurs when a term is so difficult to find, read or understand. That the plaintiff cannot fairly be said to have been aware he was agreeing to it. How many pages is the packet. The packet was about 120 pages, your honor. Okay, I looked at it, I thought it was around 170. Not counting the 1st page, the cover sheet. But even if it's 120, let's take your number and then there's another 3 page writer. And that's a lot of material for somebody. As sick as Mr. Turner was to go through, isn't it. Your honor, I do understand that the admissions packet can be perceived as lengthy. However, isn't it lengthy. It is lengthy your honor. However, admissions director, Ms. Diamond Walton took up to an hour to explain the terms of the agreement to Mr. Turner to ensure that he understood that. Well, sure, I mean, we only have her story. But, uh, because he's not alive anymore. And this was after he had his leg amputated and I mean, the man was extremely ill. You have to admit that. Yes, your honor. Okay, so. Is when I read through the agreement, which takes. An hour may not be enough time. To read it and try to understand it, but when I read through it. There were boxes that had pre. Already been printed with X's is that the way you look at the document? The X's are identical. I mean, they're not done by pen. They're done by a machine or a computer or something. Yes, and there were and there are actually some questions in the agreement saying about expenses. His money, if he has money, what bank account and all that. Nothing's filled in except what was typed beforehand. So this was a pre printed form. Everything done, you know, here's where you say. Aren't we that what we're talking about? Yes, your honor. That's correct. It was a pre printed agreement. However, as the Illinois Supreme Court has noted such agreements are. A fact of daily life, we sign these agreements when we buy cars, when we. Enter into agreements with I bought a car, you bought a car. They're not 120 pages long. And they're usually, you know, there's an arbitration agreement at the end. You know, a writer that's 3 pages long. Uh, that doesn't happen in automobile. Isn't that the reason we have procedural unconscionability? Yeah, 1st of all, we have a consumer here, right? Uh, so it's not a business and. Um, there's a lot of information there about what he's doing. Yeah, and, you know, the. What is your strongest argument to say it's not procedural. Do not procedurally unconscionable. Yes, your honor, the arbitration agreement itself. Was 3 pages long and stated in straightforward terms. At the top of the agreement in large, bold letters. It states arbitration agreement writer to the admissions contract page. 1 of 3. The 1st line states in bold. What is arbitration and goes on to explain that arbitration is an alternative means of resolving a dispute and place of court litigation. And the agreement further explains what does binding arbitration mean. And explains that finding arbitration means that both parties must comply with the arbitration decision and that decision cannot be appealed. The provisions of the agreement are set forth in short numbered paragraphs on pages 1 and 2. And in paragraph 2, it says that. And it, I think, believe is in bold. In the severability clause is buried. It's just language. It's not buried. It's in bold. By signing below, you ask that you have review. You have acknowledged that you have reviewed this writer and I understand. It's terms, right? That that's in the severability, which is kind of strange, but. I also noted, and this is just. Something that you may want to bring the attention of client. Whoever wrote this didn't know the difference between a possessive. I. T. S. and a noun. I. T. S. it says it's. I. T. apostrophe. Yes, that's a possessive. It was meant to be. I. T. S. Not not it is it's got a backwards. So, in any event. And then it says not in bold. You further indicate a little bit below. I think you further indicate that you have had the opportunity to have your attorney review it. All of that is right there in the matter of 2 paragraphs. I mean, how can that be when he's signed it that very day? We know even if we accept your testimony of an hour. I mean, he didn't. You're asking him to acknowledge you further that you have had the opportunity to have your attorney review it. That's in there. Yes, your honor. That's correct. And so what's the effect of those things that I just mentioned? Do you think. You don't think it has any effect upon procedural. Unconscionability well, procedural unconscionability is a totality of the circumstances analysis. So, it certainly is considered by this court. And it does state in the agreement that he was. Encouraged to discuss the writer with an attorney. And Miss Walton testified that she always told residents and encourage them to discuss it with an attorney. She also testified that she testified they ever talked to an attorney. No, your honor. Okay, and. After she spent an hour explaining the admissions documents to Mr. Turner. He did not ask any questions about the agreement. Rather than any condition to ask question. Mr. wasn't Mr. Turner. Coming from a hospital stay that's correct. You're discharged from the hospital. So he was in the hospital presumably for. Pretty significant or serious medical conditions, at least serious enough to be hospitalized. And 1st, thing that happens when he gets back to his home is. This 170 page contract that he's going over with. The woman who works for the nursing home. Yes, your honor. That's correct. Um, he was in and out of the hospital. I clarify it was on the very day that he got discharged from the hospital. Correct. That's correct. Your honor and. But Mr. Turner did not lack the capacity to sign the agreement here. Under Illinois law, the party seeking to set aside the transaction has the burden of proving incompetency. And persons of mature age are presumed to be competent. In competency will not be inferred merely from old age. Physical illness or defective memory and miss Turner has failed to prove Mr. Turner's and cop. And competency miss Walton. Was with Mr. Turner at the sign at the time that he signed the agreement. And miss Walton testified that he was alert. Able to speak coherently and that she had spent about an hour telling Mr. Turner the terms of the agreement. Mr. Turner had no questions. And she further testified that Mr. Turner was capable of signing his name. And he did, in fact, sign his name, indicating his ascent and understanding of the terms under Illinois law. And all that being said. If miss Walton was concerned with Mr. Turner's ability to understand the agreement. Or sign his name, miss Walton would have contacted his power of attorney. But I know who that is. It's not even. Where is that in the agreement? Where does it say about his representative? Who to talk to about. His medical conditions, there's a whole. Section there in the agreement about being able to disclose information. It's all blank. I mean, right. Is that correct? That's correct. Your honor. So so apparently they didn't ask him to any information. They didn't ask about his banking. I mean, all these lines where there to be filled in are all blank. Except for an address, you know, even the X boxes are checked not to get vaccines is already all done. You know, there is nothing that he provided. When she went over that agreement, if she did. But she does, but she did. Okay. So we'll accept that. There's no information in there whatsoever, even if as a representative power of attorney. That's what would have happened if he had refused to sign the agreement. If Mr. Turner would have refused to sign the agreement, he would still have been admitted to a period. Um, in the terms of the agreement, it states in paragraph 2. That the, this is not conditioned upon his admission to a period. And Miss Walton further testified that she always advised residents that this was an optional agreement. So, Mr. Turner could have refused to sign the agreement. And could have still been admitted to a period on. In those circumstances, and, um, I know that we said 15 minutes for an argument and I did want to save some time for rebuttal. So go ahead. Go ahead. We'll, we'll give you time. You need that if we rule against you on procedural and possibility, so I have substantive kind of possibility. So, yeah, so why don't you address that? Okay. Thank you for the additional time. Your honor. I just want to. So, and you are correct if we were to lose the procedural unconscionability argument, the Illinois Supreme Court has stated that a degree of procedural unconscionability. Is insufficient to render an agreement on enforceable. So, turning to substantive unconscionability. Substantive unconscionability concerns the actual terms of the contract. And examines the relative fairness of the obligations assumed. An agreement is substantively unconscionable. When it is inordinately 1 sided and 1 parties favor. But that's not the case here. As this as the agreement consisted of mutual promises. This had the mutual promise to arbitrate. The mutual promises to agree on the selection of a neutral arbitrator and venue. And a period agreed to pay up to 3000 dollars of Mr. Turner's arbitration or mediation costs and out of pocket expenses for claims brought by Mr. Turner. Regardless of the outcome, isn't that a drop in the bucket? Well, I. It is more consideration than what has been provided in cases. Or a case where this court has held the agreement to. The unconscionable, well, it's 2000 dollars and this is 3000 dollars. I mean, it's that much of a different. Yes, your honor, but there were more. There was more consideration provided than just the 3000 dollars. Well, what about the 250,000 dollars? What about no attorney fees? No cost. What the 250,000 dollars now that. Is a case like this is worth a lot more than that. And what limitation is there on the other side? You say everything mutual. Well, the other side, your client could go to court can't they and and sue for. On payment, or do they have to go to go to arbitration and everything. Yes, your honor, this was the mutual promise to arbitrate any and all disputes. So. It went both ways and limitation was there on the other side. Your site, what limitations on recovery. A period has the same limitations on recovery that Mr. Turner has. 250,000 that's correct. Your honor. And that they would sue for would be a lot less than 250,000 probably. Yes, that's correct. Your honor. However, this argument was actually addressed and. Justice foamers dissenting opinion and Carter, the old and operating. Um, and that case was, it went to the only Supreme Court. And it was reversed on appeal and. Justice bomber addresses very question and in that case, the damages were limited to 200,000 dollars. And Justin's bomber said that. Using the example of a fire, a resident may burn down the facility and the damages. There would far exceed the cap of 200,000 dollars. And I recognize that the likelihood of this. May not be great, but it is still possible. And as noted, both parties. Agreed to give up their attorney's fees here. So, this agreement was. 1 of mutuality and further the circuit court erroneously relied on Bain. The circuit court relied on a single case here. And that case is distinguishable for several reasons. The arbitration agreement and Bain concerned a homeowner and a home remodeling company. And the agreement provided for no statutory attorney's fees or punitive damages. It contained a strict confidentiality clause. And air room had the sole power to choose the arbitral forum. This court found that these facts established unconscionability. And in doing so, this court heavily relied on the fact that the consumer product. Provides for statutory attorney's fees and punitive damages. But most importantly, the consumer product contains an anti waiver provision. And here, unlike the consumer product. The nursing home care act does not contain an anti waiver provision. In fact, the anti waiver provision in the nursing home care act. Was held to be unconstitutional by the Illinois Supreme Court and Carter. And because the anti waiver provision was preempted by the arbitration act. And the only Supreme Court stated that. Public policy favors arbitration generally. But the anti waiver provision asserted a contrary public policy. And served as an obstacle to the enforcement of arbitration agreements. And therefore, the only Supreme Court invalidated the provision. And also, unlike the consumer product. The nursing home care act does not provide for punitive damages. And further, unlike Bain, there is no confidentiality provision here. And this was agreement of mutuality. The parties were to mutually agree on the selection of the arbitrator and the venue. So, therefore, that's minor really when you compare it to. The 250,000 dollars. And there's no negotiations, right? That's correct, your honor. This was an agreement of mutuality. Mr. Turner did not lack the capacity to enter into the agreement. And there was sufficient consideration to uphold the agreement here. As such, we would ask that this court reverse the circuit court's ruling. Thank you. Okay, let's hear from the appellee. Thank you. Good afternoon, your honors. And may it please the court. Jonathan Young on behalf of Barbara Turner. As independent administrator of the estate of Marvin Turner. In this case, the arbitration agreement that Mr. Turner signed in February of 2020. Is invalid in multiple ways as already discussed. Arbitration agreements are just like any other contracts. Can be invalidated by state law contract defenses. One of those defenses, as we've talked about already here today, is unconscionability. And I guess I can start where our counsel started with procedural unconscionability. And we feel plaintiff feels that this case outlines. That the arbitration agreement was procedurally unconscionable. As the Supreme Court has noted that it doesn't have to be substantively and procedurally. And I believe that's the Kinkel case. Is that it just needs to be one. So Mr. Turner, in this case is a consumer. And as consumers, we are inundated by foreign contracts. I think I signed one last week when I updated my phone. And that included an arbitration agreement. And while these contracts generally have found to be valid. Our Supreme Court has stated that unequal bargaining power. And other circumstances surrounding the transactions. Are to be considered when deciding when to enforce such circumstances. Do you say provide for procedural unconscionability? The circumstance in this case outlines it pretty well. Is that this Mr. Turner was a infirmed. I won't say elderly, but he was an affirmed very sick man. That was being readmitted to his home. That he lived at for about four years from a hospital. Was that established? We just heard from counsel that he had a conversation. For an hour with the intake person. And she joked with him as they usually did. I think it's important. Sorry, judge. I think it's important to say that it was. She testified that it may have been up to an hour. It's 30 minutes to an hour. So we're looking at a 30 minute difference. So when we can say whether or not it was a full hour. In this 120 pages, 123 pages, the arbitration agreement included. Mr. Turner's signature appears in that agreement 19 times. On that form boxes from page 1 to 120. So it's 19 times in the form boxes. No other information filled out where he's just clicking a button. Likely on an iPad or some other electronic device. In which that he's signing to go back home. Basically is what this is. That's what's happened. There's testimony that he has difficulty speaking. Difficulty hearing. Difficulty writing. But he has difficulty recognizing his family members at this time. But he doesn't know where he was in the world. Based on the testimony that his niece gave Mr. Turner. Can I just cancel? Did we lose a council? Okay. Did we lose you? No, your honor. I just turned my camera off. Please. So we know you're here. So the agreement or the contract, the residency contract was signed 19 times. The 20th signature was on the arbitration agreement. So while Ms. Walton may have testified that she was able to joke around with him. The pre-printed form which Mr. Turner had no involvement with filling out. There is no information that he put into the agreement. That he had any hand in drafting is completely drafted by the facility. And so there is a disparity in bargaining power as it's handed to him. As he's being readmitted into the facility from his hospital stay. So that he can continue to live there. So I know council had talked about whether or not he didn't. Or if he didn't sign it, what would have happened? And the arbitration agreement does state that if he didn't sign it. That nothing would be affecting his residency. However, the contract for admission, I believe is different. Is that he would need to sign the admissions paperwork. And the admissions packet in order to continue to stay there. Which detailed the payments, Medicaid, Medicare. How he was going to be receiving services. And so given all of that. The length of the agreement of itself. The timing of when it was signed. The amount of times that it was signed. The fact that it has pre-printed boxes. That he just clicked through and signed 19 times or 20 times. That shows that this was a procedural unconscionable contract. Did what you said he clicked through? Whether or not he was able to sign it with his hand. Is not under investigation. It's kind of distinguished. We don't know if he actually signed it. Or if it was a docu-sign. Or if what kind of contract it might have been. What it looks like is a docu-sign. Where he adopts a signature. And he's able to sign with a click of a pen. Or a button. Or what it was. But we don't have a specific recollection from Ms. Walton. Obviously Mr. Turner's not here to tell us how he signed it. Well would having. I mean I reviewed it too. I'm not an expert in handwriting. But it did look like the signature was identical. At each of those points. At each 19 times he has the exact same signature. Right so somebody. So she didn't testify whether he pushed through it. Or she did. Or what the exact explanation was. And from that we don't know exactly. Do you remember? Or you didn't ask? Is that she didn't recall the specifics of how it was presented. Of whether or not he signed through it. Or that I believe she didn't recall the exact technology. That was being used at the time in February 2021. That went and filled those out. And the date of her deposition? Would have been in 2022 your honor. So this was two years after the fact. And so in addition to procedural unconscionability. We also feel that the agreement was substantively unconscionable. As it lacks consideration or adequate consideration. Well counsel repeated over and over about mutuality. What is your response? I believe that he's giving up his rights under the Nursing Home Care Act. He's giving up. It's pretty much a cap on damages. Obviously the Cally Zinsky versus Alden Poplar Creek case. It involves giving up your statutory rights for attorney's fees. In return the mutuality or promise to arbitrate in this case. Is that I can't reasonably think of a scenario. In which the non-payment of rent. Or a scenario where they would sue the resident. Whatever get to that 250 cap. Or get you know 250 in arrears. That would bring it to that lawsuit. So really in essence. Is that he's giving up his personal injury claims. That's what the mutuality or mutual agreement arbitrate. Is that you're just abolishing the resident's PI claims. Where then they'll arbitrate non-payment of rent basically. So there's an outlier or a scenario. Where you heard about if the building burned down. Admittedly yes that could be a scenario. In which there would be $250,000 in damages. But other than that extreme scenario. An unlikely scenario. I can't see a scenario where that would happen. As far as bargain for mutuality. He had no hand in writing the agreement. He had a power of attorney for health care. And property at the time. That was not consulted. That he relied on. To be able to be his voice in these scenarios. The benefit of the agreement. Is the facility would agree to pay up to $3,000. Of the costs as discussed in that Kyle Yasinski case. The case is given to arbitration. It's likely that that amount. Cost and fees is gone quickly. If not almost immediately. And it really has no promise. That it would ever be spent on the other end. So following the reasoning. And Kyle Yasinski plaintiff would ask the court. To find that the arbitration agreement isn't valid. Based on the fact that it waives. The nursing home care act recovery attorney's fees. Limiting damages without adequate consideration. From the other side. Okay go ahead wrap it up. So Mr. Turner had lacked the capacity. Enter the agreement. Judge O'Malley was correct in stating. She did not need to have an evidentiary hearing. Based on the competency of Mr. Turner. Because the agreement. She found the agreement procedural. And substitute her unconscionable. And that's what we feel. That this should affirm in this case. Okay let's hear a brief rebuttal. Thank you your honor. So plaintiff's counsel. Heavily relies on Kyle Yasinski. But Kyle Yasinski is distinguishable. For several reasons. In Kyle Yasinski. The agreement required any claims. Brought by the plaintiff. To be resolved through mediation or arbitration. But allowed the nursing home. To litigate claims against plaintiff in court. And no explanation. Was given to the plaintiff in Kyle Yasinski. Only the defendants had the right to choose. The mediator or arbitrator. And here it's different. Because again this is the mutual promise. To arbitrate all claims. Which in itself is sufficient consideration. To uphold the agreement. And the arbitrator in venue. Was to be mutually agreed to by the parties. And the terms of the agreement. Were explained to Mr. Turner. And I also want to address what counsel said. He said that this was 30 minutes to an hour. And that actually misrepresents the testimony. Because although Miss Walton testified. That she usually took 30 minutes to an hour. To explain agreements to residents. She specifically testified that in this case. It was quote probably around the hour mark. So we are talking about an hour here. And but she couldn't remember. She couldn't remember how the agreement got signed. The procedure who typed it. You know typed into it. How he she presented it to him. But she could only remember the time. That's right. Well your honor I was. I'm glad that you brought that up. Because I do not agree with plaintiff's counsel. And how he represented the testimony. There either with Miss Walton's testimony. Because Miss Walton testified. That Mr. Turner would have had to. Write his signature. And that this was not a docu sign. And she wrote it. She said he wrote it 20 times identically. He did not testify that specifically your honor. But she did say that this required. The physical act of signing the agreement. And what I don't understand. What does that mean? One time he had a sign. And then they could reuse his signature. Is that what she's meant? Because the signatures are. I mean again I'm not an expert. But they look identical. Absolutely identical. Yes your honor. And I am not an expert either. But Miss Walton did say that. This was not a docu sign. Which means it could have been something else. Besides docu sign. Well yes that's correct. Maybe not docu sign. But some other similar type of act. Yes. But and also plaintiff's counsel. Is speaking in general terms. Regarding Mr. Turner's capacity. He has offered no evidence of Mr. Turner's capacity. At the time that he signed the agreement. Which is the relevant inquiry here. Miss Walton was with Mr. Turner. At the time that he signed the agreement. And she said that he was alert. And able to speak coherently. They joked around. Before he signed this agreement. And she spent an hour explaining it to him. He did not have any questions. And he did in fact sign the agreement. And also addressing the power of attorney. Again nothing in these power of attorney agreements. Provide that Mr. Turner relinquished. His rights to make decisions. He retained the right to make his own decisions. Under the health care power of attorney. So long as he was still able to do so. And I would also point out. That power of attorneys are planning devices. That are utilized by a number of people. That does nothing to show that someone is incompetent. And to address plaintiff's point. Regarding illiteracy. Illiteracy. Case law is clear. That illiteracy is not a defense to contract. If a party to a contract cannot read an instrument. He is under a duty to have it read to him. Before he signs it. Simply illiteracy has nothing to do. With showing that someone is incompetent. And also as plaintiff's counsel pointed out. This was not Mr. Turner's. This was presented to him upon his readmission. Mr. Turner was originally admitted to Aperion. In January 5th, 2016. And there is testimony. That his original admissions documents were lost. When the system switched over from paper to electronic. However, based on the custom and practice. We have a sworn affidavit. From Aurelia. Sorry, Miss Acosta. Um, who is vice president of business development. And she says that as part of the custom and practice. Mr. Turner would have been presented. With this agreement upon his admission. January 2016. So this was not Mr. Turner's first time. Seeing this agreement. And again, Miss Walton explained this agreement. Even though the law does not impose a duty upon her to do so. This agreement is distinguishable from Kalasinski. Because it is an agreement of mutuality. And this agreement is distinguishable from Bain. That consumed that concerned an anti-waiver provision. As I'd ask you to wrap up, please. Yes, and for the foregoing reasons. The defendant appellate respectfully request that this. Court reverse the circuit court's decision. Thank you. Okay, on behalf of my colleagues. I'd like to thank each of you for your. Very well done briefs and good arguments here today. We will consider the matter and issue. An opinion or an order forthwith. We are adjourned.